# United States District Court
# Central District of California
# Western Division

| | |
|---|---|
| GLOBAL HEALTH SCIENCES, *et al.*,<br>    Debtors. | CV 04-01486 TJH |
| NZMP (USA), INC., *et al.*,<br>    Plaintiffs,<br>    v.<br>RICHARD D. MARCONI, *et al.*,<br>    Defendants. | Findings of Fact<br>and<br>Conclusions of Law |

The claims of Cross-Claimants Fred Siegel, Blossom Siegel, and Elaine Berke for equitable indemnity and contribution against Cross-Defendants Richard D. Marconi, Paul Buxbaum, and BGA Consulting were tried before the Court, sitting without a jury. The Court, having considered all of the evidence and the parties' briefs, issues the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. D&F Industries, Inc., Raven Enterprises, Inc., Dynamic Products, Inc., and West Coast Sales, Inc. [collectively, "predecessor companies"] manufactured products used in the production of dietary and nutritional supplements.

2. Herbalife, an international manufacturer of dietary and nutritional supplements, was D&F Industries's main customer and its source of substantial revenue.

3. Cross-Claimant Fred Siegel was president, chief executive officer and a shareholder of the predecessor companies. As president and chief executive officer, he was responsible for day-to-day operations.

4. Cross-Claimants Blossom Siegel and Elaine Berke were shareholders of the predecessor companies.

5. Cross-Defendant Richard Marconi was a co-founder and shareholder of the predecessor companies.

6. In 1998, Marconi consolidated the predecessor companies into a new entity – Global Health Sciences, Inc. ["GHS'] – through a leveraged buyout. Marconi was GHS's sole shareholder.

7. Cross-Defendant Paul Buxbaum, head of Cross-Defendant BGA Consulting, helped locate investors to finance the leveraged buyout.

8. The purchase price for the predecessor companies was $225 Million, despite the fact that the fair value of the predecessor companies was less than $74 Million.

9. Marconi financed the leveraged buy-out by having GHS issue $225 Million worth of bonds.

10. All of the GHS bonds were underwritten by Citibank, which sold the bonds to institutional investors.

11. Before the consolidation, Marconi told Fred Siegel that, through the leveraged buy-out, Marconi would assume full ownership of the consolidated predecessor companies, that Fred Siegel would receive full compensation for his ownership interests in the predecessor companies from the buy-out proceeds, and that GHS would shoulder the $225 Million debt as a result of the buy-out.

12. In assembling the predecessor companies' financial data as part of the due diligence process, Marconi realized that Fred Siegel had integral knowledge of the day-to-day operations and that he was in a better position than Marconi to assess the reliability of the financial forecasts produced by Citibank and GHS's outside lawyers and accountants.

13. The financial forecasts concluded that GHS would be a financially viable entity, despite its enormous leveraged buy-out debt load, based on the assumption that GHS would continue the predecessor companies' long-term relationship with Herbalife and that GHS would be financially capable of acquiring additional market dominance through the takeover of competitors.

14. While Fred Siegel did not specifically testify that he thought that the GHS financial forecasts were reasonable, Marconi testified that Siegel had told him that he did, indeed, believe the financial forecasts were reasonable. The Court finds Marconi's testimony on this point to be credible.

15. Given Fred Siegel's knowledge and experience in the day-to-day operations of the predecessor companies, his knowledge that the amount of debt incurred by GHS through the buy-out exceeded the fair value of the predecessor companies, and his knowledge of GHS's dependence on Herbalife, he was well aware of the financial burden that would be placed upon GHS by the leveraged buy-out debt and GHS's risk of failure.

• • • • • • • •

16. Fred Siegel, as president of the predecessor companies, signed the signature pages of various documents related to the leveraged buy-out, including an offering memorandum which laid out the risks associated with the transaction.

17. The offering memorandum fully explained the nature of the leveraged buy-out and how the predecessor companies would be consolidated into GHS. In fact, for a brief period, Fred Siegel was president of GHS after the consolidation so that he could execute closing documents for the leveraged buy-out. Thus, Fred Siegel was fully aware of the nature of the leveraged buy-out transaction and how the predecessor companies would be structured following the transaction's conclusion.

18. By signing the offering memorandum, Fred Siegel affirmed to investors that GHS would be on sound financial footing.

19. Fred Siegel testified that he never read the leveraged buy-out documents that he signed.

20. Defendant Blossom Siegel, Fred Siegel's former wife, was an officer of D&F Industries early in that companies' history. After her divorce from Fred Siegel, she was no longer involved in the day-to-day affairs of any of the predecessor companies. As part of the divorce's property distribution. Blossom Siegel received shares of D&F Industries.

21. Blossom Siegel, also, signed the signature pages of various documents related to the leveraged buy-out.

22. Blossom Siegel testified that, like Fred Siegel, she did not read the leveraged buy-out documents that she signed. Further, Blossom Siegel testified that she did not inquire into the source of the money for the buy-out or the fair value of her shares of D&F Industries.

• • • • • • • •

23. Elaine Berke provided some of the seed money for the creation of D&F Industries and, therefore, became one of its shareholders.

24. Berke testified that, like Fred Siegel and Blossom Siegel, she did not read the leveraged buy-out documents that she signed. Further, Berke testified that she did not inquire into the source of the money for the buy-out or the fair value of her shares of D&F Industries.

25. The GHS Bond proceeds totaled $196 Million after expenses and legal fees.

26. All of the shareholders of the predecessor companies, including Marconi, Fred Siegel, Blossom Siegel, and Berk, received GHS bond proceeds in exchange for their shares of the predecessor companies. Marconi received $38,603,456.00, Fred Siegel received $67,264,560.00, Blossom Siegel received $26,046,881.00, and Berke received $5,209,376.00 in leveraged buy-out proceeds.

27. Following the completion of the leveraged buy-out, Buxbaum became an officer of GHS.

28. In 2000, GHS lost its Herbalife supply contract.

29. Saddled with $225 Million in debt and the loss of a major customer, GHS was rendered financially insolvent and unable to pay its debts.

30. In 2001, GHS filed for bankruptcy.

31. The Organized Committee of Unsecured Creditors ["Creditor Trust"] filed this adversary action on behalf of GHS's bondholders to collect the $225 Million paid to the predecessor companies' shareholders.

32. On March 29, 2006, the Creditor Trust reached settlements with Cross-Defendant Marconi for $500,000. On May 4, 2006, The Court dismissed Creditor Trust's claims against Cross-Defendant Marconi pursuant to a settlement agreement and stipulation.

33. The July 17, 2006, Final Pre-Trial Conference Order set forth Creditor Trust's claims for constructive and intentional fraudulent transfer against all then-unsettled defendants, claim for breach of fiduciary duty against Fred Siegel, and claim for unfair competition against all of the then-unsettled defendants.

34. The Final Pre-Trial Conference Order, also, contained, in relevant part, the cross-claims for equitable indemnity and contribution asserted by Cross-Claimants Fred Siegel, Blossom Siegel, and Berke against Cross-Defendants Marconi, Buxbaum, and BGA Consulting.

35. On February 13, 2007, Defendants Fred Siegel, Blossom Siegel, and Berke reached a settlement with Creditor Trust to resolve all claims alleged by Creditor Trust against them. Fred Siegel agreed to pay Creditor Trust $11,347,000.00, Blossom Siegal agreed to pay $4,230,000.00, and Berke agreed to pay $423,000.00. In sum, these three Defendants paid Creditor Trust $16 Million.

36. Fred Siegel, Blossom Siegel, and Berke made their settlement contingent upon obtaining a determination of good faith settlement from the Court, which the Court issued. However, after Marconi had fully performed their settlement, they moved for an order of determination of good faith settlement from this Court. The Court denied the motion.

37. Fred Siegel, Blossom Siegel, and Berke now seek equitable contribution and indemnification from Marconi, Buxbaum and BGA Consulting.

38. Fred Siegel's approval of the sale of the predecessor companies to GHS was a fraudulent transfer, and Fred Siegel, Blossom Siegel, and Berke's sale of their shares of the predecessor companies to GHS was a fraudulent transfer. This finding is based solely on the evidence presented at trial, and is based in no part on the fact that Fred Siegel, Blossom Siegel, and Berke reached a settlement with the Creditor Trust. Moreover, in their closing briefs, Fred Siegal, Blossom Siegel and Berke

acknowledge that the leveraged buy-out of the predecessor companies was, indeed, a fraudulent transfer.

39. While there is no direct evidence of Fred Siegel's intent to defraud the bondholders, there is sufficient evidence to establish that he turned a blind eye to the detriment of GHS's bondholders by permitting GHS to incur significantly more debt than financially reasonable. Even if Fred Siegel had not read the documents he signed, he was aware of the day-to-day operations and finances of the predecessor companies and should have realized the financial impact of the leveraged buy-out.

40. The Court infers Fred Siegel's fraudulent intent from his personal retention of a significant portion of the leveraged buy-out proceeds and his failure to fully scrutinize the degree to which GHS faced financial peril. Fred Siegel should have reasonably known that GHS, after the leveraged buy-out, would be in serious risk of financial insolvency.

41. Likewise, there is substantial evidence that Blossom Siegel participated in the fraudulent transfer. Like Fred Siegel, Blossom Siegel signed the documents related to the leveraged buy-out without reading them. Given the large amount of money she received from the leveraged buy-out, the Court infers Blossom Siegel's intent to defraud from her failure to inquire into the nature and extent of the buy-out's impact on GHS's financial well-being as well as her failure to reconcile the amount of money she received for her stock relative to its fair value. Had she read the documents she signed, Blossom Siegel should have reasonably believed that GHS would be placed in serious financial impairment.

42. Elaine Berke, while receiving less money than Fred Siegel or Blossom Siegel, was no less culpable in the fraudulent transfer. She, too, did not read the documents that she signed in connection with the leveraged buy-out and did not inquire into the nature of the transaction for which she was a party. Given the

monetary magnitude of the transaction, Elaine Berke should have reasonably believed, had she read the documents she signed, that GHS was assuming significantly more debt than it could shoulder to remain financially solvent. Thus, the Court infers her fraudulent intent from her inaction.

43. As a result of the fraudulent transfer, Cross-Claimants Fred Siegel, Blossom Siegel, and Elaine Berke came to this Court with unclean hands.

44. Any finding of fact erroneously categorized below as a conclusion of law is hereby incorporated into these Findings of Fact.

## CONCLUSIONS OF LAW

1. Indemnity and contribution are equitable claims. *Exxess Electronixx v. Heger Realty Corp.*, 64 Cal. App. 4th 698, 715, 75 Cal. Rptr. 2d 376, 387 (1998).

2. The Uniform Fraudulent Transfer Act, Cal. Civil Code § 3439.04 states:

    (a) A transfer made or obligation incurred by a debtor is fraudulent as to the creditor … if the debtor made a transfer or incurred the obligation as follows:

        (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

        (2) Without a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

            (A) was engaged or was about to engage a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to a business or transaction.

            (B) Intended to incur, or believed or should have reasonably

      believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(b)  In determining such actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

 (1)  Whether the transfer or obligation was to an insider.

 (2)  Whether the debtor retained possession or control of the property transferred after the transfer.

 (3)  Whether the transfer or obligation was disclosed or concealed.

 (4)  Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

 (5)  Whether the transfer was of substantially all the debtor's assets.

 (6)  Whether the debtor absconded.

 (7)  Whether the debtor removed or concealed assets.

 (8)  Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

 (9)  Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

 (10)  Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

 (11)  Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

3.  "Debtor" means a person liable for a claim. Cal. Civ. Code § 3439.01.

4.  The issue of actual intent is a question of fact determined by a

preponderance of the evidence. *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 834, 28 Cal. Rptr. 884, 890 (2005).

5. Because direct evidence of intent to hinder, delay, or defraud is not common, California courts often infer intent from common circumstances suggestive of intent. *In re Beverly*, 374 B.R. 221, 235 (9th Cir. 2007).

6. The "badges of fraud" in Cal. Civ. Code § 3439.04(b) are meant to provide guidance to courts in the form of certain examples of actual intent to defraud, not compel a certain outcome nor provide an exhaustive list of circumstances where actual intent is present. *Filip*, 129 Cal. App. 4th at 834, 28 Cal. Rptr. 3d at 890.

7. The presence of none, one, or more of the "badges of fraud" does not in itself indicate the presence of intent to defraud. *Filip*, 129 Cal. App. 4th at 834, 28 Cal. Rptr. 3d at 890.

8. Fred Siegel, Blossom Siegel, Berke, Marconi, Buxbaum, and BGA are jointly liable for fraudulent transfer. *See Garcia v. Superior Court*, 45 Cal. App. 2d 31, 35, 113 P.2d 470, 472 (1941).

9. One who seeks equity must do equity. *Kemp v. Enemark*, 194 Cal. 748, 752, 230 P. 441, 443 (1924).

10. If a transaction before a court of equity is tainted with fraud, the Court has a duty to investigate whether fraud is present and should apply the doctrine of unclean hands if, after investigating, the Court uncovers evidence of fraud in the transaction. *Rosenfeld v. Zimmer*, 116 Cal. App. 2d 719, 722, 254 P.2d 137, 139 (1953).

11. The doctrine of unclean hands is a complete defense to the claims of a party seeking equitable relief. *Rosenfeld*, 116 Cal. App. 2d at 722, 254 P.2d at 139. Therefore, the Court will not order Cross-Defendants Marconi, Buxbaum, and BGA

Consulting to indemnify or contribute to Cross-Claimants Fred Siegel, Blossom Siegel, and Elaine Berke.

    12. Any conclusion of law erroneously categorized as a finding of fact is hereby incorporated into these Conclusions of Law.

Dated: August 14, 2008

_____
Terry J. Hatter, Jr.
Senior United States District Judge